CI \ FILED IN CLERK'S OFFICE
S.D.C. Atlanta

APR 0 4 2007

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

| | | |
|---|---|---|
| NIKOLAI VIDINLIEV and IVAN M. MANASIEV, on behalf of themselves and all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| \ | ) ) ) | CIVIL ACTION NO.: **1:07·CV-0762** **TWT** |
| CAREY INTERNATIONAL, INC., a Delaware Corporation, | ) ) ) | CLASS ACTION |
| Defendant. | ) ) | |

## COMPLAINT

Plaintiffs, Nikolai Vidinliev and Ivan M. Manasiev, through their undersigned attorneys, file this Complaint against the Defendant, Carey International, Inc. ("Carey International"), a Delaware corporation, and allege:

### JURISDICTION AND VENUE

1.     This suit is brought pursuant to the Fair Labor Standards Act ("FLSA" or the "Act"), 29 U.S.C. § 201 *et seq*  The Defendant, Carey International, is a chauffeured services company. The Defendant has a widespread, nationwide policy of intentionally misclassifying its drivers as

-1-

independent contractors when they are really employees, and on that basis not paying them overtime to which they are entitled pursuant to the FLSA.

2.     Jurisdiction is conferred upon this Court by 29 U.S.C. § 216(b) and 28 U.S.C. § 1331.

3.     Venue is proper for the United States District Court for the Northern District of Georgia because:

(a)     Plaintiffs are employed in the Northern District of Georgia by the Defendant, which at all material times conducted, and continues to conduct, business in the Northern District of Georgia; and

(b)     Venue lies pursuant to 28 U.S.C. § 1391(b) & (c), because the acts that give rise to Plaintiffs' claims occurred within the Northern District of Georgia, and because the Defendant is subject to personal jurisdiction there.

## CONDITIONS PRECEDENT

4.     Plaintiffs have complied with all conditions precedent in this case, or those conditions precedent have been waived.

## PARTIES

5.      Plaintiffs are current or former limousine drivers for the Defendant. Those individuals contemplated to join this action are current or former drivers.

6.      Defendant Carey International, Inc. is a Delaware corporation whose principal place of business is in Washington, D.C.  Carey International, Inc. pays the Plaintiffs and ultimately benefits from their work.  In addition to being employed by Carey International, Inc., Plaintiffs, who worked out of the Atlanta office, were employed by a local franchise (Carey Atlanta).  Carey Atlanta and Carey International, Inc. were joint employers as set forth in 29 C.F.R. § 791.2 (2002).

7.      Defendant is an "employer" pursuant to 29 U.S.C. § 203(d) of the Fair Labor Standards Act.

8.      Defendant is an "enterprise" pursuant to 29 U.S.C. § 203(r) of the Fair Labor Standards Act.

9.      Defendant is an enterprise "engaged in commerce" pursuant to 29 U.S.C. § 203(s) of the Fair Labor Standards Act.

10.      During all times relevant to this action, Defendant was an enterprise engaged in commerce as defined in 29 U.S.C. §§ 203(r) and 203(s).

-3-

11.     Each Plaintiff is or was an "employee" pursuant to 29 U.S.C. § 203(e)(1) of the Fair Labor Standards Act.

12.     Plaintiffs are or were non-exempt employees of Defendant who were subjected to the payroll practices and procedures described below, and who worked in excess of forty (40) hours during one or more workweeks within three (3) years of the filing of this Complaint.

13.     At all times pertinent to this Complaint, Defendant failed to comply with 29 U.S.C. §§ 201-219 in that Plaintiffs, and all those similarly situated, performed services for Defendant for which no provision was made to properly pay for those hours in which overtime and unpaid wages were required to be paid.

## STATEMENT OF FACTS

14.     Carey International, as self-described in its advertising, is "the world's premier chauffeured services company, offering the widest range of chauffeured ground transportation services for personal travel, business travel, road shows, meetings and events, private aviation, luxury hotels and more."

-4-

**Carey International Has a Practice of Mischaracterizing Drivers**

**as "Independent Contractors" and "Independent Operators".**

15.    Carey International is and has been intentionally misclassifying the

drivers as "independent contractors" and "independent operators", when it knew

that the drivers are employees who are not allowed to work for other companies

(even in non-transportation related capacities); could make no profit or loss

decision, but rather had their incomes tied to how many transfers (and what the

quality of those transfers was) that Defendant assigned; and are required to follow

Defendant's policies with respect to where and how they had to perform their

services.

16.    In a 1997 filing with the Securities Exchange commission, Defendant

stated:

> The Company's ability to benefit from conversions of
>
> salaried chauffeurs to independent operators will depend, in
>
> part, on the Company's continued ability to classify
>
> independent operators as third party contractors rather than as
>
> employees.  The Company does not pay to withhold any federal
>
> or state employment tax with respect to or on behalf of

independent operators.  The Internal Revenue Service (the

"IRS") previously challenged the Company's independent

operator policy at its owned and operated business in

Philadelphia, but in March 1997 agreed to settle the challenge

without an adjudication of a violation of IRS regulations.  Also

in March 1997, the IRS approved guidelines that chauffeured

vehicle service providers such as the Company can follow in

order to treat independent operators as third party contractors

rather than as employees.  These guidelines distinguish a third

party contractor from an employee using several factors based

upon whether or not the individual, among other things, (i)

invests cash in the venture, (ii) has the potential to realize a

profit or loss; (iii) can make his or her service available to the

public and (iv) is required to comply with company policies

regarding how and when to provide services.  The Company

believes that its practices substantially conform to these

guidelines, and that, as a result, its independent operators will

be treated as third party contractors.  If, however, the

-6-

Company's practices are determined not to conform with the

guidelines, or if it is adjudicated that the Company could

become responsible for certain past and future employment

taxes. There can be no assurance that, in the event of such an

adverse adjudication, there will not be a material adverse effect

on the Company's business, financial condition and results of

operations.

17. Carey's 1999 SEC 10-K Report, in explaining how chauffeurs are

compensated, sets forth the following:

An important component of Carey's strategy involves the

preferred use of independent operators rather than salaried

chauffeurs operating Company-owned vehicles. An

independent operator takes responsibility for owning, operating

and maintaining his or her own vehicle. The Company believes

that acting as an independent operator creates incentives for the

chauffeur to become more productive, efficient and service-

oriented, thereby increasing the profitability of the chauffeur

and the Company. The objective of the Company's independent

operator strategy is to instill in each chauffeur the sense of responsibility and dedication characteristic of an independent business owner.

The use of independent operators allows the Company to reduce its labor and capital costs, convert fixed costs to variable costs and generate revenues from fees paid by independent operators. Because of the greater responsibility borne by independent operators, the Company is able to allocate fewer resources to oversee its vehicle operations. As a result, the Company can focus to a greater extent on support services, business development, administration, billing, quality assurance and sales and marketing.

Each independent operator enters into an agreement with the Company to provide prompt and courteous service to the Company's customers with a properly maintained, late model vehicle consistent with the Company's standards. The cost of a new vehicle ranges from approximately $35,000 to $65,000, depending upon whether it is a sedan or a limousine and the

-8-

features included in the vehicle. Each new independent operator agrees to pay an initial fee to the Company, acquire his or her vehicle and pay all of the maintenance and operating expenses of the vehicle, including gasoline. The independent operator agreements entered into by the Company prior to October 1999 generally provide for a term of 15 years, initial fees of $45,000 to $75,000 and an interest rate of 15.75% per year. Agreements entered into subsequent to September 1999 generally provide for a term of five years at a fixed monthly fee, rather than an initial fee and interest.

The independent operator agreement provides that the Company will bill and collect all revenues (as defined in the agreement) and remit to the independent operator 60% to 70% of such revenues. In this arrangement, the Company assumes the risk of collecting from each customer and generally pays the independent operator his or her share regardless of whether the Company is paid by the customer. An independent operator's failure to meet the high standards of service

-9-

associated with the Carey name constitutes a breach of the
agreement and gives rise to a right of the Company to terminate
the agreement.

Independent operators also generally require financing to
purchase their vehicles. Typically, independent operators have
utilized banks, vehicle financing companies or CLI Fleet, Inc.
("CLI Fleet"), a finance company that specializes in providing
financing to the chauffeured vehicle service industry.

18.    Plaintiffs are paid a percentage of the charge to the customer for the
ride in the vehicle, and are not paid overtime, even though they regularly worked
overtime hours.  The Defendant knew that Plaintiffs were working overtime, and
that federal law requires employees to be compensated at time and one-half per
hour for overtime pay.

## The Plaintiff Drivers Are Employees Despite Carey International's

## Mischaracterization of Them.

19.    Despite Carey International's mischaracterization, Plaintiffs and those
similarly situated are or were employees.  Plaintiffs are required to follow Carey
International's assignment procedures (the "Procedures"), and specifically were

not allowed to reject rides assigned by the Defendant's dispatch; are not allowed to work for other limousine companies (or for themselves); and are required to follow the orders of dispatch, such as waiting long periods of time for a passenger at the designated pick-up location, or maintaining lengthy on-call status.

20.     Carey International has a Chauffeured Certification Program (the "Program") which requires all the drivers to attend.  Drivers attending the Program must pay to attend, and are not compensated for their time in the Program.  The drivers are given a manual at the class called the Chauffeurs Certification Program Participant's Guide (the "Guide"), which essentially contains the Defendant's policies and procedures concerning how the drivers are supposed to conduct a transfer (a chauffeured transportation ride).

21.     Defendant's management told the drivers that they must follow the rules and regulations contained in the Certification Program.  The Certification Program controlled every aspect of how a driver was required to perform for the Defendant.

22.     The Defendant's management directed and/or performed the instruction of the Program.  Defendant specifically instituted the program so that

-11-

its chauffeurs on a nationwide basis would perform a transfer in the exact same way in order to maintain an extremely high level of service for branding purposes.

23.    The drivers were required to follow the rules and regulations set forth in the guide, or they would be disciplined.  The Defendant's management would document any driver's violation of the Certification Program Guide in a driver advisory, and a driver could be terminated because of such violations (depending upon the level of severity), and the drivers were expected to follow the Guide. The drivers in fact actually followed the procedures and policies in the Guide. The local managers of all of the Defendant's various branches and offices work closely with the Defendant's Washington, D.C. office concerning the policies and procedures that Defendant wanted to implement concerning drivers, and how the drivers should perform their duties.  The local managers frequently and regularly called Washington, D.C. to obtain advice on how to deal with drivers who had performance issues.

24.    The failure of Plaintiffs to follow the Defendant's procedures would have resulted in discipline and possible termination.

25.    Plaintiffs were required to wear a standard Carey uniform, drive a Carey vehicle, and maintain Carey markings on the vehicle

-12-

26.   The checks for all of the employees, including the drivers, were drafted and signed in the Washington, D.C. office of Carey International, Inc.

27.   All charges to customers and discounts were determined by the Defendant.   Defendant Carey International, Inc. receives 18% of revenues for all jobs that come though its reservation system.

28.   The drivers had no say with respect to when they would be paid, how they would be paid, or how much the customer should be billed.

29.   The drivers did not receive hourly compensation, or any specific compensation, for waiting time, on-call time, or portal-to-portal time or other travel time or working time, incurred in the performance of work assignments or time incurred in maintaining the vehicles pursuant to Carey's standards.

30.   The drivers were completely dependent upon the Defendant for the assignment of work; the drivers could make no independent business decisions which could have made them more "profitable".

31.   While driving for the Defendant, the drivers were prohibited from driving for any other limousine company, and were even prohibited from working other jobs that were not in the transportation industry.

32.     Carey International did not keep records concerning the number of hours actually worked by Plaintiffs, and all others similarly situated to them.  The Defendant does have records of the compensation actually paid to Plaintiffs, and those records are in the possession and custody and control of Defendant.

33.     Carey International's violations of the FLSA are willful.  Although the Internal Revenue Service has questioned the Defendant's designation of drivers as independent contractors, and although the Defendant has been previously sued for FLSA overtime violations, the Defendant has failed to pay its drivers that the back overtime and unpaid wages that it owes, and has failed to modify payroll practices to lawfully pay Plaintiffs the overtime and unpaid wages required by the FLSA to be paid.

**Plaintiffs' Work Activities Are Not Exempt Under the Motor Carrier Act.**

34.     The Defendant is not a motor carrier whose transportation of passengers is subject to the Secretary of Transportation's jurisdiction under section 204 of the Motor Carrier Act.

35.     Title 29 C.F.R. § 782.7(b)(1) mandates that "[w]here . . . it has been authoritatively held that transportation of a particular character within a single State is not in interstate commerce as defined in the Motor Carrier Act . . . there is

-14-

no basis for an exemption under section 13(b)(1), even though the facts may establish a 'practical continuity of movement' from out-of-State sources.

36.     Title 29 C.F.R. § 782.7 (2000), states that "[e]ngagement in local transportation which is entirely intrastate commerce provides no basis for exempting a motor carrier employee."  A binding former Fifth Circuit case was relied upon by the Department of Labor when it adopted § 782.7, because that Fifth Circuit case holds that "[e]ven if the goods or people originated outside the state, if the motor carrier does not drive their vehicles across state lines, then they are not involved in interstate commerce" and thus the Motor Carrier Act exemption is not applicable.

37.     The Defendant does not have a contractual through-ticketing arrangement with an air carrier, providing for the continuous passage or interchange of a passenger which is interstate in nature.

38.     The Defendant does not have a contractual common arrangement with an air carrier, providing for the continuous passage or interchange of a passenger which is interstate in nature.

-15-

39.     Plaintiffs have not provided transportation to or from locations in other states, and at all material times, drove a vehicle that weighed less than 10,001 lbs.

### Plaintiffs' Work Activities Are Not Exempt as Taxicab Services.

40.     Defendant is not in the business of operating taxicabs.

41.     During the time that they work for the Defendant, Plaintiffs were not taxi cab drivers, or licensed to drive taxi cabs.

42.     The drivers are not free to develop their own clientele on their own initiative, but rather are required to send any customer that approaches them about their service to the corporate Defendant.

43.     Many of the transfers that Plaintiffs made were "as directed", which means that multiple people are in a vehicle, and those people are paying by the hour to be driven around to multiple locations.

44.     Defendant occasionally assigned routes to their drivers, and required them to take specific routes.

45.     The Defendant had contracts with local businesses for recurrent transportation, such as hotels.

-16-

46.     Plaintiffs never drove a taxi cab (or vehicle containing a taximeter)

for the Defendant, and the Defendant does not have the licensing to utilize taxi

cabs or taxi drivers, and the Defendant does not own any taxi cabs.

47.     Defendant does not advertise itself as providing taxi transportation.

48     Plaintiffs could not "cruise" for passengers, but rather all

transportation that they performed had to be pre-arranged.

49.     Plaintiffs have retained the undersigned legal counsel to prosecute

this action on their behalf, and have agreed to pay them a reasonable fee for their

services.

50.     Plaintiffs are entitled to their reasonable attorneys' fees if they are the

prevailing parties in this action.

## CLASS ALLEGATIONS

51.     Plaintiffs seek to form a class action consisting of the following

individuals:

> Drivers/chauffeurs of Carey International, Inc., working in the
>
> United States who have been classified as "independent
>
> contractors" or "independent operators" and so were not
>
> compensated by being paid time and one-half for every hour or

-17-

part of an hour worked over forty (40) in a given workweek
during the time period three years prior to the filing of the
Complaint to the present.

52.     Plaintiffs seek to form a nationwide collective action under § 216(b)
of the Fair Labor Standards Act to include all drivers and chauffeurs utilized by
the Defendant, who are or have been misclassified as "independent operators" or
"independent contractors" and thereby denied their rights to overtime pay under
the FLSA.  Plaintiffs seek to form a nationwide collective action under § 216(b) of
the FLSA to remedy the Defendant's violations of the FLSA, and to allow all
similarly situated drivers and chauffeurs to receive notice concerning their opt-in
rights

## COUNT I –

## RECOVERY OF OVERTIME COMPENSATION AND MINIMUM WAGE

Plaintiffs, and all those similarly situated, re-adopt, incorporate by
reference, and re-allege Paragraphs 1 through  52 above as though fully set forth.

53.     Plaintiffs, and all those similarly situated, are entitled to be paid time
and one-half for each hour worked in excess of forty (40) in each workweek, and
for waiting time and on-call time.

-18-

54.     In the course of employment with Defendant, Plaintiffs worked the number of hours required of them and regularly worked in excess of forty (40) hours per workweek but were not paid time and one-half for all hours worked in excess of forty (40) during a workweek.

55.     By reason of the willful and unlawful acts of Defendant, Plaintiffs, and all those similarly situated, have suffered and are entitled to recover damages, plus incurred costs and reasonable attorneys' fees.

56.     As a result of Defendants' violations of the Act, Plaintiff, and all those similarly situated, are entitled liquidated damages for the preceding three years.

WHEREFORE, Plaintiffs, on behalf of themselves and of all those similarly situated, demand judgment against Defendant for the unpaid wages and overtime payments due them for the hours worked for which they have not been properly compensated, liquidated damages, pre- and post-judgment interest, reasonable attorneys' fees and costs of suit, and any further relief that the Court deems just.

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand trial by jury on all issues so triable.

Dated: __April 4, 2007__

JOHN K. FITZGERALD, P.C.

JOHN K. FITZGERALD
Georgia Bar No. 262160
Attorney for Plaintiffs

6000 Lake Forrest Drive
Suite 440
Atlanta, GA 30328-3896
(404) 843-9388
Fax (404) 847-9297
E-mail: jfitzy@mindspring.com

Kozyak, Tropin & Throckmorton, P.A>
Thomas A. Tucker Ronzetti
Detra Shaw-Wilder
dps@kttlaw.com
2525 Ponce De Leon Blvd.
Suite 900
Coral Gables, FL 33134-6012
Tel. (305) 372-1800
Fax (305) 372-3508
E-mail: tr@kttlaw.com